SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00392-AB** |
| **v.** | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS** |
| **RICARDO OLIVAS-SENTAEL,** | |
| **Defendant.** | |

The United States of America, through Scott E. Bradford, United States Attorney for the

District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court

to deny defendant's motion to suppress physical evidence and statements.  The defendant was

lawfully arrested after he was observed resupplying drugs to a known drug house.  Based upon

probable cause, the Investigators were permitted to search his car pursuant to the mobile vehicle

exception to the Fourth Amendment.  However, following his arrest, the defendant instead

knowingly and voluntarily gave Investigators consent to search his car, his phone, and his motel

room – which resulted in the seizure of drugs and evidence of drug dealing.  After the defendant

was arrested he was also advised of his constitutional *Miranda* rights, in Spanish, acknowledged

**Government's Response to Defendant's Motion to Suppress**                    **Page 1**

understanding his rights, and knowingly and voluntarily waived his rights and spoke with Investigators. His motion to suppress the seized physical evidence and his statements should be denied.

## A.    Factual and Procedural Summary.

On September 3, 2025, members of the Multnomah County Sheriff's Office (MCSO) Special Investigations Unit (SIU) were surveilling a known drug house located on N.E. 99th Avenue, in Portland, Oregon. The investigation of this drug house started back in 2022, when an individual who was arrested identified the resident of the drug house as selling fentanyl, methamphetamine, heroin, and crack cocaine. The investigation continued on and off over the years. In 2024 and 2025, through a series of conversations with a confidential informant, who knew of the house and knew people who had purchased drugs from the resident of the house; their investigation into a drug trafficking organization (DTO) in which they learned that the resident of the house was one of their major customers; complaints from area residents who identified the residence as a source of drug dealing ("drug house complaints"); and, based upon observations of apparent customers who appeared to be frequenting the residence to buy drugs, they knew the house was occupied by a commercial quantity-level (large volume) drug dealer who was using as a location to store and distribute drugs. The lead investigator was MCSO Deputy Jarrett Miller.[1]

---

[1]    Deputy Miller is also a FBI Special Federal Officer (SFO) authorized to investigate federal controlled substance offenses. He has been with MCSO since September 11, 2017. He holds both Basic and Intermediate Police Officer Certifications accredited by the Oregon Department of Public Safety Standards & Training (DPSST). He has attended hundreds of hours of police training focused on the investigation of controlled substances cases, to include including the International Narcotics Interdiction Conference, the California Narcotics Officers Conference, and Oregon Narcotics Enforcement Conference, in which he has learned about current trends in the illicit drug world, the basic profile of drug traffickers, and the handling of confidential informants. During his employment as a sworn law enforcement officer, he has investigated hundreds of criminal incidents, to include controlled substance offenses. He has personally conducted at least 50 drug investigations resulting in warrants being issued and large quantities of drugs being seized.

**Government's Response to Defendant's Motion to Suppress**                    **Page 2**

In 2025, as part of their investigation, Deputy Miller and others repeatedly conducted surveillance on the residence and observed consistent foot traffic into and out of it. Most of the foot traffic appeared to be drug customers, people who appeared dirty and unkept, leading him to believe they lived a transient lifestyle and were drug-affected individuals visiting the residence to buy drugs.

On September 3, 2025, while once again watching the residence, at around Noon or a little after, Deputy Miller observed a Hispanic male, later identified as the defendant, arrive in a newer black Volkswagen Passat bearing Washington license plate CPU8763. The defendant stood out to Deputy Miller because he did not resemble the common customers they had seen going into and out of the house as he was clean in appearance and driving a newer vehicle.

Deputy Miller saw the defendant park curbside near the residence, grab a large backpack from the rear of the vehicle, and then go into the residence. Deputy Miller observed that the backpack the defendant grabbed appeared to contain a heavy object as it looked weighted at the bottom. From his investigation, as noted above, Deputy Miller had already learned that the drug dealer who lived at this residence was sourced by a Mexico-based DTO and that the DTO would send their runners to meet customers at various locations to re-supply them with controlled substances.

Shortly after he entered the residence, maybe less than 10 minutes later, Deputy Miller observed the defendant exit the residence while holding the same backpack. However, this time the backpack appeared to be lighter as it was slung over his shoulder and did not have the appearance of containing the same heavy object he had previously observed.

Based upon his training and experience and the investigation up to this point, Deputy Miller believed he had just observed a drug delivery – a re-up or re-supply – occur at the

**Government's Response to Defendant's Motion to Suppress**                    **Page 3**

residence.  A drug re-up/re-supply is where a person comes and delivers additional drugs to the customer/dealer operating out of the residence for purposes of further distribution.  Deputy Miller knows, based upon his training and experience, that drug dealers who deal in larger quantities of drugs conceal their product in large bags, containers, sacks and more, especially when they are operating in an open air environment.  Furthermore, Deputy Miller knows that these re-up drug deals are typically between two parties and conducted in a short amount of time.  Based on his knowledge of the residence, knowledge of the dealer who lives at the residence, observations, training and experience he believed the defendant arrived to provide drugs to the dealer at the residence and then left.

As the defendant then drove away from the location in the Passat, members of SIU followed him as he drove to a nearby Home Depot, which was also within the greater Portland, Oregon metropolitan area, and he parked in a parking spot.  SIU Detective Jones told Deputy Miller that he observed the defendant get out of the Passat and start looking around the lot.  But the defendant did not go anywhere else, he simply stayed by his car while looking around.  Given what they knew, they believed the defendant was looking for a customer.

Based upon their belief that the defendant had just re-supplied a known drug house with controlled substances, deputies then devised a plan to take the defendant into custody.  At approximately 12:35 p.m., SIU Investigators moved in and used their vehicles to box in the defendant's vehicle, and they took him into custody.  In doing so, the Investigators used the lights and sirens on their undercover police vehicles and the Investigators had drawn their firearms.  The Investigators were in plain clothes and were wearing tactical vests identifying them as police officers.  After the defendant was placed in handcuffs Investigators holstered their

///

**Government's Response to Defendant's Motion to Suppress**                    **Page 4**

firearms and turned off the lights and sirens on their vehicles. The defendant was placed in the front seat of Deputy Miller's undercover police vehicle.

Deputy Miller contacted the defendant, who told him that he spoke Spanish. Deputy Miller then contacted a Spanish interpreting service via his work cellphone and the service assisted with the translation. Using the speaker phone function on his cellphone, Deputy Miller would speak in English and the interpretive service would translate it into Spanish for the defendant. When the defendant would answer, the service would translate his answers from Spanish into English for Deputy Miller.

Using the interpreting service, Deputy Miller advised the defendant of his constitutional *Miranda* rights and the defendant acknowledged he understood his rights. When asked what was in the car, the defendant told Deputy Miller that there was fentanyl inside the backpack that was in the Passat. Deputy Miller asked the defendant for permission to search the vehicle and his cellphone and the defendant gave consent to search the Passat along with the cellphone he was holding in his hand. The defendant also provided the passcode to the cellphone. Deputy Miller never made any threats to the defendant. Deputy Miller describes the defendant as being exceedingly cooperative during the course of their interview.

Deputy Miller, using the interpretive service, then read an MCSO Consent to Search Form to the defendant, which the defendant signed. The form was in English but was translated for the defendant into Spanish prior to him signing it.

Members of SIU searched the Passat while Deputy Miller continued to speak with the defendant. Inside the Passat Investigators found the following items, which were then seized:

1.     A large Ziplock bag of suspected fentanyl that was inside a backpack;

2.     Multiple plastic packaging bags from inside the backpack;

**Government's Response to Defendant's Motion to Suppress**                    **Page 5**

3.   Two counterfeit $100 bills;

4.   $3,750.00 U.S. Currency that was inside the backpack;

5.   Two (2) digital scales with apparent drug residue on them that were found inside the backpack;

6.   $441.00 in U.S. Currency that was found in defendant's wallet;

7.   Miscellaneous receipts from center console;

8.   A bag of suspected fentanyl that was found in the center console; and,

9.   A Motel 6 room key card.

As Deputy Miller and the defendant continued to talk, the defendant told him that he left Mexico weeks prior and moved to Portland. The defendant also told Deputy Miller that he sold drugs for a boss whose name he did not know. While they were speaking, Deputy Miller observed that the defendant's phone was consistently ringing and showed one number that was repeatedly calling. The prefix for the number showed a Seattle, Washington area code. The defendant told Deputy Miller that the caller was another member of the organization who instructed him where to pick up drugs and also where to meet the customers who were to receive the drugs. The defendant also told Deputy Miller that he primarily sold fentanyl and the fentanyl in the Passat belonged to him.

When asked where he was staying, the defendant said that since he had been in Portland he had been sleeping in the Passat and, when asked about the Motel 6 room key they found, the defendant stated that the Motel 6 room key card was from a previous time he stayed at the motel.

The defendant also told Deputy Miller that he had conducted two drug transactions the day prior to being arrested. The defendant showed Deputy Miller his cellphone and Deputy Miller saw an address for a customer named "Tony," whom he claimed he had sold drugs to, and

**Government's Response to Defendant's Motion to Suppress**                    **Page 6**

an address for the Home Depot where the defendant had been arrested. The defendant admitted that he had been sent to the Home Depot parking lot to sell drugs to a customer named "Jay" and had completed that drug deal in the lot prior to being arrested.

Members of SIU secured the Passat, it was left in the parking lot and the keys were later placed in MCSO property. The defendant was transported to the Multnomah County Detention Center where he was booked on federal charges.

Deputy Miller then went to the Motel 6, located at 9225 SE Stark Street, Portland, Oregon and inquired about the room key card that was found in the Passat. The staff told Deputy Miller the card was still active to room 233 and that the room was rented under the defendant's name with a checkout date of September 4, 2025.

Concerned that there could be someone else associated with the DTO within the room, members of SIU went to room 233 where Deputy Miller used the key card to access the room to make sure no other occupants were present. Deputy Miller did not search for evidence but only entered the room to check whether anyone else was present to ensure any potential evidence would not be destroyed or tampered with. Nothing was seized and nothing was touched. SIU then exited and secured the room and two detectives stood by to ensure no one re-entered the room.

Deputy Miller went back to the Multnomah County Detention Center where he recontacted the defendant. With the assistance of Corrections Deputy Mendoza, who is a native Spanish speaker assisting with translation, Deputy Miller again advised the defendant of his constitutional *Miranda* rights, which the defendant again acknowledged he understood his rights.

Deputy Miller told the defendant what he had learned at the Motel 6. The defendant apologized and told Deputy Miller he wanted to be honest with him. No threats or promises

**Government's Response to Defendant's Motion to Suppress**                     **Page 7**

were made to the defendant. The defendant stated he rented room 233 under his name and had been staying in the room. The defendant said he had slept in the room the night prior to being arrested. The defendant also told Deputy Miller that there were drugs in the room and then clarified there would be at least one kilogram of fentanyl inside of it. The defendant said that the drugs in the room were not his and another person he called "Primo" provided him with the amount of drugs needed for the customers. The defendant was then asked for and gave consent for the deputies to search room 233. The defendant also allowed Deputy Miller to add the room to the MCSO Consent Form he had previously signed. Once again, Deputy Miller viewed the defendant as exceedingly cooperative during their conversation.

Deputy Miller then went back to Motel 6 and assisted members of SIU with searching room 233 and the following items of evidence were found and seized from inside the room:

1. Approximately one (1) kilogram of suspected fentanyl;

2. Multiple money remitters and receipts (the money remitters showed defendant sending money to Mexico and there was a handwritten drug ledger on the back of a money remitter receipt);

3. Multiple kilogram wrappers;

4. Ten (10) bags of suspected methamphetamine; and,

5. $35,800.00 in U.S. Currency that was found in a duffle bag.

All the evidence was then taken to the Multnomah County Sheriff's Office.

On September 4, 2025, a criminal complaint was filed. On September 5, 2025, the defendant made his initial appearance in federal court and was detained. On October 7, 2025, defendant waived indictment by the grand jury and was arraigned on a three count Information charging him with engaging in a conspiracy to distribute and possess with intent to distribute

**Government's Response to Defendant's Motion to Suppress**          **Page 8**

fentanyl and methamphetamine, possession with intent to distribute fentanyl, and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

Defendant has moved the court to suppress the evidence seized in this case alleging that Deputy Miller unlawfully arrested him in violation of the Fourth Amendment when he was placed in handcuffs and searched; that his consent to search was invalid; that the search of the motel room was invalid; and, his statements were involuntarily made.  He is incorrect and his motion should be denied.

**B.      Applicable Law.**

At its core, the Fourth Amendment is all about reasonableness.  *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.") (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (internal quotation marks omitted).  Whether a seizure is reasonable turns "'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Mimms*, 434 U.S. at 109.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because arrests are "seizures" of "persons," they must be reasonable under the circumstances. *See Payton v. New York*, 445 U.S. 573, 585 (1980).  Here, at every step, Deputy Miller acted reasonably in accordance with the Fourth Amendment.

**1.      Deputy Miller had probable cause to arrest defendant.**

Probable cause to arrest exists if, based upon the "totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability

**Government's Response to Defendant's Motion to Suppress**                    **Page 9**

that [the suspect] had committed a crime." *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002). To determine whether an officer had probable cause for an arrest, the court examines the events leading up to the arrest and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (*quoting Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Because probable cause "deals with probabilities and depends on the totality of the circumstances," *Pringle*, 540 U.S. at 371, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Probable cause . . . is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 571 U.S. 320, 338 (2014). "It is also well established that the judgments made by law enforcement officers in the heat of their battle against crime need not be assessed in the abstract; weight may be given to the experienced judgment of the officers." *Valencia-Amezcua*, 278 F.3d at 906. "In drug investigations the court may consider the experience and expertise of the officers involved" because their "experience and expertise may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer." *Id.*

Here, Deputy Miller, a trained narcotics officer, was watching what he knew was a house used for storing and distributing controlled substances (a drug house). Prior to September 3, 2025, he knew:

- That a commercial quantity-level (large volume) drug dealer was living and using the residence to store and distribute drugs;

- On multiple occasions, Deputy Miller and others had conducted surveillance on the residence and observed constant foot traffic into and out of the residence;

**Government's Response to Defendant's Motion to Suppress**                    **Page 10**

- Most of the foot traffic appeared to be drug customers who appeared dirty and unkept, leading him to believe they lived a transient lifestyle and were drug-affected individuals visiting the residence to buy drugs;

- That the drug dealer who lived at this residence was sourced by a Mexico-based Drug Trafficking Organization (DTO); and,

- That the DTO would send their runners to meet customers at various locations to re-supply them with controlled substances.

On September 3, 2025, Deputy Miller made these additional observations:

- He observed the defendant show up at the residence in a vehicle and pull to the curb;

- The defendant's vehicle was a newer vehicle with Washington state plates, which stood out as different than what he typically observed at the house;

- He observed the defendant grab a backpack from the back of the car and go straight into the residence;

- The backpack the defendant was carrying appeared to have a heavy object within it;

- The defendant was inside the residence for only a short amount of time;

- When the defendant came back out he was again carrying the backpack and this time it appeared to be lighter (it did not appear to have the same heavy object within it);

- The defendant then got back into his car and drove away; and,

///

///

**Government's Response to Defendant's Motion to Suppress**                     **Page 11**

- When the defendant arrived at the Home Depot parking lot he parked, got out, and appeared to be looking around for someone, who the Investigators believed was likely another drug customer.

Deputy Miller, drawing upon his training and experience as a narcotics investigator, absolutely knew that what he witnessed at the drug house was a resupply of drugs to the owner of the residence. His conclusion, under the totality of the circumstances was both reasonable and correct.

In arguing that the Investigators lacked probable cause to arrest him, defendant attempts to associate his visit to the drug house as simply a situation of "mere presence" at a known drug location, citing to a series of cases (*Sibron, Strickler, Collins, Ybarra, Robertson,* and *Valencia-Amezcua*). Defendant's Motion at 5-6. In doing so, two things immediately jump out – (1) defendant does not contest that Deputy Miller knew the residence was a drug house; and, (2) what defendant ignores – and what distinguishes this case from those relied upon by the defendant – is what Deputy Miller saw **before** and **after** the defendant entered the known drug house. Defendant was correct in trying to distinguish *Valencia-Amezcua* from *Robertson*, but the attempt does not work.

As a starting point, it is absolutely "well settled that mere presence," by itself, "with known drug offenders is insufficient to give probable cause to arrest." *Valencia-Amezcua*, 278 F.3d at 907. In drawing the line between what is only "mere presence" and what is probable cause to arrest, the courts look to see if the Investigators are able to present any evidence that moves the situation beyond "mere presence." *Id.* What the government will refer to as mere presence, plus. The Investigators do not need much evidence to do so, and here, they have more than simply "mere presence."

**Government's Response to Defendant's Motion to Suppress**                         **Page 12**

In *Robertson,* the main example highlighted by defendant in support of his arguments, the police received information that a residence contained a methamphetamine lab. *United States v. Robertson,* 833 F.2d 777, 778 (9th Cir. 1987). Knowing that a resident (Johnson) had an arrest warrant the officers traveled to the house and when they arrived they observed a woman (Steeprow) walking away from the house on the walkway and a man (Johnson) in the doorway. *Id.* at 779. Seeing the officers Johnson stepped back into the residence and locked the door. *Id.* Steeprow (the woman they saw) was taken into custody. *Id.* A backpack she was carrying was subsequently searched with a warrant. *Id.* Officers never saw Steeprow go into the house and they never saw Steeprow actually leave the house. Rather, they observed her "outside the house as she was trying to leave the premises." *Id.*

Steeprow argued that her arrest was unsupported by probable cause and the Court agreed. *Id. at 782.* In doing so, the Court held, rightfully, that the officers lacked "the slightest indication that Steeprow was involved in criminal activity" and "[h]er mere presence on the premises, without more, cannot support an arrest if her under these circumstances." *Id.* at 782. Rather, the Court was looking for more and the government simply did not have it. As the Court noted, while it was "undisputed that the officers had probable cause to believe criminal activity was afoot in the house" they did not have particularized probable cause as to Steeprow. *Id.* at 783.

Here, unlike the situation in *Robertson*, Deputy Miller had "more" than the defendant's mere presence around a drug house, which is exactly what the Ninth Circuit is looking for in deciding whether there is particularized probable cause as to the person arrested. *United States v. Valencia-Amezcua*, 278 F.3d 901 (9th Cir. 2002) provides both an example of the additional evidence the Court is looking for and the lens through which the Court should examine the evidence.

**Government's Response to Defendant's Motion to Suppress**        **Page 13**

In *Valencia-Amezcua*, Investigators had information that the resident of the house was previously involved in a suspected drug transaction and during a consent search of the residence they found evidence the house contained methamphetamine. *Id.* at 904-5. While walking through the house they also discovered Valencia-Amezcua sitting on a bed, along with two other men, which was positioned in front of a hidden door containing a methamphetamine lab. *Id.* at 905. Investigators opened the hidden door and found the methamphetamine lab. *Id*. Valencia-Amezcua was then arrested. *Id.*

The defendant Valencia-Amezcua filed a motion to suppress alleging that Investigators lacked probable cause to arrest him. *Id.* In granting the motion, the district court, relying on *United States v. Robertson*, 833 F.2d 777 (9th Cir. 1987), found there was insufficient evidence "to create probable cause for the arrest of Amezcua because (1) the methamphetamine lab equipment was hidden from view; (2) no methamphetamine odor emanated prior to the commencement of the search; and (3) none of the men on the bed appeared to exercise control over the house" and that Valencia-Amezcua's "mere presence in the bedroom could not support a finding of probable cause." *Id.* at 907.

The Ninth Circuit disagreed and reversed. In doing so, the Court held that the district court "incorrectly relied on our decision in *Robertson*" and that the *Roberston* was "distinguishable and has no persuasive force" in this situation because the evidence linking Valencia-Amezcua to the crime went beyond "mere presence," and instead established probable cause the defendant was involved in criminal activity. *Id.*

In making their determination the Court found that, because:

- The house contained evidence of a "large-scale methamphetamine production operation requiring the participation of several individuals"; and,

**Government's Response to Defendant's Motion to Suppress**                    **Page 14**

- The defendant's "proximity to the hidden door and his seated position with others on a bed, blocking entrance to the secret room, suggested that Amezcua had participated in the methamphetamine lab's activities" and "[t]hat the men were obscuring the lab's secret door suggested a purpose to deter the officers from its discovery,"

under "the totality of the circumstances a reasonable and prudent narcotics officer could believe that there was a fair probability that Amezcua was involved in criminal activity." *Id.* 907-8

A similar result should be reached in this case. This was not a situation where Investigators merely observed someone walking away from a known drug house with no additional ties to that residence. Far from it. Here there was much more than "mere presence." Just like what the Court found in *Valencia-Amezcua*, there was presence, plus.

Deputy Miller observed the defendant arrive at the house; the house was a well-known drug house from which the resident distributed drugs; Deputy Miller knew that the organization supplying the house with drugs used runners to deliver drugs; the defendant was driving a newer vehicle that stood out as inconsistent with what was normally seen at the house; the defendant did not appear to be a drug affected individual like the others seen entering the house; the defendant grabbed a backpack from the vehicle and the backpack appeared to have a heavy object within it; the defendant went straight into the residence; the defendant stayed for only a brief amount of time; when the defendant left the residence the backpack he was carrying no longer appeared to contain the heavy object; and, then the defendant drove to another location, parked, and appeared to be waiting for someone. Under the "totality of the circumstances" and viewed through the lens of a highly trained, experienced, "reasonable and prudent narcotics officer," there was a "fair probability that the defendant was involved in criminal activity – that

**Government's Response to Defendant's Motion to Suppress**                    **Page 15**

he had just resupplied the known drug house with narcotics.  Deputy Miller and his team thus had probable cause to arrest the defendant.

Defendant's motion should be denied.

**2.      Deputy Miller, at a minimum, had reasonable suspicion to detain defendant in handcuffs to investigate his suspicion that defendant had committed a crime.**

Even when officers lacked probable cause, under *Terry v. Ohio*, 392 U.S. 1 (1968), the "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation marks omitted).  Reasonable suspicion is a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (quotation marks omitted).  It is "not a particularly high threshold to reach," and "falls considerably short of satisfying a preponderance of the evidence standard." *Id*. (quotation mark omitted).  It is "a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id.* (quotation marks omitted) (alterations adopted).

Furthermore, "cases have made clear that an investigative detention does not automatically become an arrest when officers draw their guns" or use handcuffs.  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002); *United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) ("because we consider both the inherent danger of the situation and the intrusiveness of the police action . . . pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not automatically convert an investigatory stop into an arrest that requires probable cause."); *Rousseau*, 257 F.3d at 929 ("The

**Government's Response to Defendant's Motion to Suppress**                                  **Page 16**

Supreme Court and this court have permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety and have held that the use of force does not convert the stop into an arrest if it is justified by a concern for the officer's personal safety."). "There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Rather, "[c]ourts consider the totality of the circumstances." *Id*. (internal quotations omitted). Indeed, "[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable." *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995). Such safety decisions are typically "best left to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers." *United States v. Williams*, 419 F.3d 1029, 1034 (9th Cir. 2005).

Here, Investigator's use of handcuffs and boxing in defendant's vehicle was a "reasonable response to legitimate safety concerns." *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996). At the time defendant was placed in handcuffs, Deputy Miller was investigating a drug trafficking crime that he believed was supported by probable cause, as outlined above. Furthermore, Deputy Miller knows that drug dealing is a dangerous business and drug dealers are often armed. Collectively and under the totality of the circumstances, this was a situation that, as it progressed, could easily have escalated and become dangerous.

Under the totality of the circumstances, Deputy Miller was justified in placing defendant in handcuffs while he continued his investigation. Even if the Court finds probable cause lacking, Deputy Miller's actions were still reasonable under the circumstances that he was facing and defendant's motion should be denied.

**Government's Response to Defendant's Motion to Suppress**          **Page 17**

3.   **Defendant provided valid consent to search the car and his cellular telephone.**

Voluntary consent to search constitutes a waiver of Fourth Amendment rights. *Schneckloth v. Bustamonte,* 412 U.S. 218, 235  (1973); *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023) (quoting *United States v. Basher*, 629 F.3d 1161, 1167 - 68 (9th Cir. 2011)) (law enforcement "may search a car when they are given voluntary, unequivocal, and specific consent.").  Courts examine the totality of the circumstances surrounding the consent to determine whether it was given voluntarily.  *Bustamonte,* 412 U.S. at 227.  The government must only prove that  the consent was voluntary by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 (1974).

The Ninth Circuit has identified the following five factors that courts should consider when determining whether consent to search was voluntary: "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'" *United States v. Patayan Soriano,* 361 F.3d 494, 502 (9th Cir. 2004) (*quoting United States v. Jones,* 286 F.3d 1146, 1152 (9th Cir. 2002)).  Each case of consent should be examined on its own facts and no one factor is determinative of the issue of voluntariness and "these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry."  *Id.; see also, Bustamonte*, 412 U.S. at 224, (rejecting "talismanic definition of 'voluntariness' mechanically applicable" to all situations); *see also United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995) ("although we have established these factors to aid in the decision making process, the full richness of every encounter must be considered . . . Every encounter has its own facts and its own dynamics. So does every consent").

**Government's Response to Defendant's Motion to Suppress**                                    **Page 18**

Here, although the defendant was in custody and Investigators initially displayed their firearms, at the time consent was sought the firearms were holstered, the defendant had been advised of his constitutional *Miranda* rights, and the situation was once again calm. The defendant was advised that he had the right to refuse consent and the Investigators did not make any threats, they did not tell the defendant they could obtain a warrant if he refused consent, and no promises were made. The defendant was entirely cooperative and forthcoming. Under the totality of the circumstances defendant's consent was voluntarily given and Deputy Miller was justified in conducting a search of the defendant's vehicle and cellphone. Any evidence discovered during these searches was also justifiably seized.

4. **Even without consent, law enforcement Investigators were allowed to search the defendant's car pursuant to the mobile vehicle exception.**

Even if the Court has concerns about the consent the defendant gave to search his car, law enforcement Investigators were still permitted to search the vehicle under the automobile exception to the Fourth Amendment's warrant requirement because they had probable cause to believe that the car "contain[ed] evidence of a crime." *United States v. Rodgers*, 656 F.3d 1023, 1028 (9th Cir. 2011). Probable cause to believe that evidence will be found in a particular vehicle "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Warrantless searches of automobiles under the automobile exception are allowed for two reasons: First, the ready mobility of a motor vehicle makes it impracticable for law enforcement officers to secure a search warrant, and, Second, individuals have a diminished expectation of privacy in motor vehicles because motor vehicles are subject to pervasive governmental regulation. *California v. Carney*, 471 U.S. 386, 390-391(1985).

///

**Government's Response to Defendant's Motion to Suppress**                    **Page 19**

Here, not only did Deputy Miller had probable cause that the defendant had committed a drug trafficking crime, as outlined above, based both upon his training and experience and defendant's statements, he also had reason to believe that additional drugs would be found within the vehicle. Accordingly, Investigators were permitted to search the Passat under the automobile exception to the Fourth Amendment's warrant requirement and seize any evidence they found.[2]

**5.      The initial entry into the motel room was justified by exigent circumstances.**

After Investigators learned that the defendant had reserved room 233 at the Motel 6, they used his key card to access the room for the sole purpose of making sure no one else was present and to prevent destruction of potential evidence. They did not have to force entry and they did not cause any damage to the door or room. Once they determined no one else was present, they exited the room. They did not touch anything. After exiting the room Deputy Miller then sought and obtained the defendant's consent to fully search the room. At this point, the Investigators already knew the defendant was involved in drug trafficking and believed there was likely evidence of such in his room. Additionally, because the defendant was associated with an organization it was entirely reasonable, after the defendant was arrested and did not come back to the room, for Investigators to fear that there could be another person in the room who would either tamper with, move, or destroy potential evidence.

During their initial entry into the room the Investigators did not conduct a full search, but rather they merely performed a cursory inspection to make sure no one else was present in the room who could tamper with or destroy any potential evidence. Their limited entry into the hotel

---

[2]      Pursuant to their lawful search, Investigators in turn are permitted to seize any incriminating items that are in plain view. *Horton v. California*, 496 U.S. 128, 133 (1990) ("[when] an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."); *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (the warrantless seizure of an item in plain view is justified when its incriminating nature is "immediately apparent.").

**Government's Response to Defendant's Motion to Suppress**                    **Page 20**

room was entirely lawful and reasonable and was only motivated by their desire to prevent the potential tampering with or destruction of evidence.

As the Supreme Court has held, "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement" and that "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable." *Kentucky v. King*, 563 U.S. 452, 462 (2011). Such an exigency would include "the need 'to prevent the imminent destruction of evidence.'" *Id.* at 460.

Furthermore, even if the Court finds that the Investigators should not have entered the room, there is nothing to suppress from this entry and the Exclusionary Rule does not mandate the exclusion of the evidence subsequently seized based upon defendant's consent. First, The Investigators did not seize anything when they made a cursory inspection of the room looking for potential co-defendant and they did not use anything gleaned from their entry in gaining consent. Second, as the Supreme Court has made clear, not all Fourth Amendment violations result in the exclusion of evidence – rather suppression is a "last resort" and should only be applied where "its deterrence benefits outweigh its 'substantial societal costs.'" *Hudson v. Michigan*, 547 U.S. 586, 591, 594 (2006) (refusing to apply the exclusionary rule when officers violated the Fourth Amendment's knock and announce rule in the execution of a warrant); *Penn. Bd. of Prob. & Parole v. Scott*, 52 U.S. 357 (1998) (the exclusionary rule is a judicially created remedy that is applied "only where its deterrence benefits outweigh its substantial social costs."). The balance tips in favor of exclusion when "the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," but not "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis v. United States*, 564 U.S. 229,

**Government's Response to Defendant's Motion to Suppress**                     **Page 21**

238 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009), *and United States v. Leon*, 468 U.S. 897, 909(1984)).  Courts do not apply "the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct."  *Davis*, 564 U.S. at 240.

Here, the Investigators entered the motel room in good faith to make sure no one else was present who could tamper with or destroy evidence, they did not conduct a full-blown search, after verifying no one was present they quickly exited the room, and then they sought consent from the defendant to fully search the room.  They did not use anything they learned in their quick and cursory search to gain consent and they could have, if consent was not given, nevertheless obtained a warrant to search the room.[3]

The officers looked in the motel room to make sure there was no one present who could tamper with or destroy evidence – a valid and noble law enforcement purpose.  There is no deterrent value to be gained by the suppression of the later seized evidence.

Defendant's motion should be denied.

**6.      The search of defendant's motel room was based upon valid consent.**

As noted above, voluntary consent to search constitutes a waiver of Fourth Amendment rights. *Schneckloth v. Bustamonte,* 412 U.S. 218, 235 (1973).

For reasons similar to those outlined above, defendant's consent to search his motel room was voluntarily given.  Although the defendant was still in custody a period of time had passed since he was initially arrested.  The defendant had now been advised twice of his constitutional *Miranda* rights and the situation was calm.  Previously, the defendant had been advised that he

---

[3]      Unlawfully obtained evidence should not be suppressed if it would have been inevitably discovered. *Nix v. Williams*, 467 U.S. 431 (1984).  If "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence will not be suppressed despite a constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989); s*ee also United States v. Ramirez*, 473 F.3d 1026, 1031 (9th Cir. 2007).

**Government's Response to Defendant's Motion to Suppress**                                    **Page 22**

had the right to refuse consent. Once again, Deputy Miller did not make any threats, he did not tell the defendant he would obtain a warrant if he refused consent, and he did not make any promises to the defendant. Again, the defendant was entirely cooperative and forthcoming. Under the totality of the circumstances defendant's consent was voluntarily given and Deputy Miller was justified in conducting a search of the defendant's motel room and any evidence discovered during the search was justifiably seized.

### 7.    Defendant's statements were voluntarily made and admissible.

When a defendant is in custody or similar custodial situation and subject to police questioning there is a two-step process employed to determine whether any statements made by the defendant are admissible. First, a court must determine if law enforcement complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Second, the court must determine if any resulting statements were voluntarily made. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Here, agents complied with *Miranda* and the defendant's statements were voluntarily made and are thus admissible against him at trial.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The primary purpose of the Fifth Amendment is to prevent police from coercing involuntary statements from suspects. In *Miranda*, the Supreme Court established a procedural mechanism, the specific advisal of rights, to safeguard a defendant's Fifth Amendment privilege against the inherently coercive nature of custodial interrogation. *Miranda,* 384 U.S. at 444. Thus, before law enforcement agents may interrogate a suspect in custody, *Miranda* holds they must inform the suspect he has the right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford one, one will be appointed for

**Government's Response to Defendant's Motion to Suppress**                **Page 23**

him prior to questioning. *Id*. at 479; *see also United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006); *United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982).

A person, after being advised of his or her rights may still voluntarily, knowingly, and intelligently waive those rights. *Miranda,* 384 U.S. at 475; *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008). In assessing both the validity of the *Miranda* waiver and whether the resulting statements are voluntary, "depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *United States v. Chapman*, 175 F. 4th 1118, 1132 (9th Cir. 2026) (assessing validity of a *Miranda* waiver) (internal cites omitted); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (assessing both the validity of the *Miranda* waiver and whether the resulting statements are voluntary).

Courts consider the following factors to determine whether a defendant's *Miranda* waiver was "'knowing' and 'intelligent'": (1) defendant's mental capacity, (2) whether defendant signed a written waiver; (3) whether defendant was advised in his native tongue or had a translator; (4) whether defendant's rights were individually and/or repeatedly stated to him; and (5) whether defendant had prior experience with the criminal justice system. *Chapman*, 175 F. 4th at 1132. In assessing whether the defendant's statements are voluntary; courts examine the totality of the circumstances. *Moran*, 475 U.S. at 421; *see also Pollard,* 290 F.3d at 1034*; Derrick v. Peterson*, 924 F.2d 813, 819, 821 (9th Cir. 1990) (examining age, intelligence and past experience with justice system); *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (examining nature and location of questioning).

When a defendant has been advised of his constitutional rights, and there is no conduct by the police that overbears the person's free-will, the resulting statements are presumed to be voluntarily made and admissible against the person. *Id.; see also Colorado v. Connelly*, 479

**Government's Response to Defendant's Motion to Suppress**                    **Page 24**

U.S. 157, 167 (1986) (absent coercive activity a post-advisal statement is considered voluntary for Fifth Amendment purposes); *Derrick v. Peterson*, 924 F.2d 813, 816 (9th Cir. 1990) ("a confession is only involuntary under the fourteenth amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will" and the "[p]ersonal characteristics of the defendant are constitutionally irrelevant absent proof of coercion.").

Should a subject invoke his *Miranda* rights, the police must cease interrogation. *Miranda*, 384 U.S. at 473-4.

Similarly, any statements a defendant makes after being advised of his *Miranda* rights must also be "knowingly and voluntary made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). "[T]he government must prove . . . voluntariness by a preponderance of the evidence" and "[a]n inculpatory statement is voluntary only when it is the product of a rational intellect and a free will." *United States v. Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988) (internal citations omitted). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id*. at 1366; *see also Chapman*, 175 F. 4th at 1133 (voluntariness determined by examining whether officers obtained the defendant's statements "by physical or psychological coercion or by improper inducement."); *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) (in determining whether defendant's statements were voluntarily made, the courts look to whether "the confession [is] the product of an essentially free and unconstrained choice by its maker."). The interview's length, tone, and the absence of any reticence from the defendant all factor into this analysis. *Chapman*, 175 F. 4th at 1133.

Here, the defendant made statements on two separate occasions: the first was immediately after his arrest in the Home Depot parking lot and the second was when Deputy

**Government's Response to Defendant's Motion to Suppress**                    **Page 25**

Miller talked with him a second time while he was in the jail. Prior to any interview the defendant was advised of his constitutional *Miranda* rights in Spanish, his native language, and he indicated that he understood his rights. At the time the defendant was advised of his rights he was in custody.

In the Home Depot parking lot, the defendant was handcuffed in the front seat of Deputy Miller's vehicle. Although the Investigators drew their weapons when they arrested the defendant, at the time he was advised of his rights their weapons were back in their holsters. After being advised of his *Miranda* rights, the defendant was not threatened nor was he promised anything. Rather, Deputy Miller advised the defendant and simply asked if he understood his rights and if he was willing to talk. The defendant said he did and he was. The defendant was exceedingly cooperative, responded appropriately to questions, and the interview was casual.

When the defendant was interviewed a second time at the jail, he was still in custody, he was once again advised of his constitutional *Miranda* rights in Spanish, and once again he acknowledged understanding his rights. Just like before the defendant remained very cooperative, responded appropriately to questions, and the interview was casual. The defendant was not threatened nor was he promised anything.

Under the totality of the circumstances defendant's waiver of his *Miranda* rights was knowingly and voluntarily made and his subsequent statements were likewise knowingly and voluntarily made. His statements are admissible and his motion should be denied.

///

///

///

**Government's Response to Defendant's Motion to Suppress**      **Page 26**

## Conclusion

For the reasons set forth herein, we respectfully request that the Court deny defendant's motion to suppress physical evidence and statements.

Dated:  June 17, 2026.                              Respectfully submitted,

                                                   SCOTT E. BRADFORD
                                                   United States Attorney


                                                   /s/ *Scott Kerin*

                                                   SCOTT M. KERIN, OSB # 965128
                                                   Assistant United States Attorney