SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00392-AB** |
| **v.** | **GOVERNMENT'S SUPPLEMENTAL REPLY TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS** |
| **RICARDO OLIVAS-SENTAEL,** | |
| **Defendant.** | |

The United States of America, through Scott E. Bradford, United States Attorney for the District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court to deny defendant's motion to suppress physical evidence and the statements he made to law enforcement investigators while in jail.

The validity of law enforcement's actions all depends on the lens through which the Court examines the facts. If, as defendant seeks, all the events and facts are viewed as isolated incidents without respect to the detective's training and experience, then the Court may question the law enforcement response. However, if the Court examines the "totality of the circumstances" through the lens of an extremely experienced drug investigator, then there is

abundant probable cause to arrest the defendant. Once the Court finds there was probable cause to arrest the defendant, the subsequent search of his vehicle and motel room were also reasonable and the defendant's statements he made when interviewed at the jail, after being advised of his *Miranda* rights, are also admissible.

The defendant is currently charged in a three count Information with engaging in a conspiracy to distribute and possess with intent to distribute fentanyl and methamphetamine, possession with intent to distribute fentanyl, and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. On May 18, 2026, defendant filed a motion to suppress evidence and statements he made to law enforcement. ECF 27. On June 17, 2026, the government filed its response. ECF 31. On August 3, 2026, the Court held an evidentiary hearing in which Multnomah County Corrections Deputy Juan Mendoza and Multnomah County Sheriff's Office Detective Jarrett Miller testified. On August 28, 2026, defendant filed his reply to the government's response. ECF 37.

The government believes the following questions are before the Court:

1. On September 3, 2025, after observing the defendant carry what he believed to be controlled substances into a known drug house that was supplied by a Mexico-based Drug Trafficking Organization, did Detective Miller have probable cause to arrest the defendant? The answer is yes. Based upon the totality of the circumstances and examined through the lens of an extremely well-trained and experienced narcotics investigator Detective Miller had probable cause to arrest the defendant for engaging in a conspiracy to distribute controlled substances.

2. After arresting the defendant, did Detective Miller have probable cause to search defendant's vehicle for additional controlled substances, cash, or drug trafficking

related records? Likewise, the answer is yes. Based upon the totality of the circumstances and examined through the lens of an extremely well-trained and experienced narcotics investigator Detective Miller had probable cause to search the defendant's vehicle for additional evidence related to a conspiracy to distribute controlled substances.

3. Can the government show that the defendant's consent to search his car, given in the Home Depot parking lot, was valid? The answer is no. Because the Spanish speaking translator who assisted Detective Miller is unavailable, the government cannot show that the defendant gave valid consent at that time.

4. Are defendant's statements made in the Home Depot parking lot admissible? The answer is no. Because the Spanish speaking translator who assisted Detective Miller is unavailable, these statements cannot be used against the defendant at trial.

5. Based upon the exigencies of the situation, was Detective Miller's cursory search of defendant's motel room, in which nothing was seized or exploited, justified to prevent potential destruction of evidence? The answer is yes. Because Detective Miller had both probable cause and exigent circumstances, his brief entry into the room to ensure evidence would not be destroyed was reasonable. Furthermore, even if the initial entry was not permitted, there was nothing about the initial entry into the motel room that taints the subsequent consent defendant provided to search the room and suppression of the later seized evidence is unwarranted.

6. At the jail, did the defendant provide voluntary consent to search his motel room? The answer is yes. With the assistance of a fluent Spanish-speaking corrections

deputy, the defendant was asked for consent to search the motel room and he knowingly and voluntarily gave it.

7. Were the defendant's statements at the jail knowingly and voluntarily made? The answer is yes. With the assistance of a fluent Spanish-speaking corrections deputy, the defendant was advised of his constitutional *Miranda* rights, acknowledged and waived his rights, and voluntarily spoke with Detective Miller.

Each issue is dealt with in detail below.

## I. On September 3, 2025, after observing the defendant carry suspected narcotics into a well-known drug house that was being supplied by a Mexico-based Drug Trafficking Organization, with a hub in Seattle, Washington, Detective Miller had probable cause to arrest the defendant.

At its core, the Fourth Amendment is all about reasonableness. *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.") (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (internal quotation marks omitted). Probable cause to arrest exists if, based upon the "totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002). To determine whether an officer had probable cause for an arrest, the court examines the events leading up to the arrest and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (*quoting Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Because probable cause "deals with probabilities and depends on the totality of the circumstances," *Pringle*, 540 U.S. at 371, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232

(1983). "Probable cause . . . is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Kaley v. United States*, 571 U.S. 320, 338 (2014). "It is also well established that the judgments made by law enforcement officers in the heat of their battle against crime need not be assessed in the abstract; weight may be given to the experienced judgment of the officers." *Valencia-Amezcua*, 278 F.3d at 906. "In drug investigations the court may consider the experience and expertise of the officers involved" because their "experience and expertise may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer." *Id.*

Following the evidentiary hearing, the Court knows the following facts to be true:

1. Detective Jarrett Miller is an extremely well-trained and experienced narcotics investigator, who is familiar with how drug trafficking organization operate, how drug dealing occurs, how drug houses (locations for distributing and using drugs) operate, and the characteristics of drug affected (drug using) individuals. Transcript from August 3, 2026 (TR) 48 – 65.

2. That, based upon information from other investigations and neighborhood complaints, the residence at 310 NE 99th Avenue, Portland, Oregon was a well-known "drug house" in were a large volume drug dealer was living and using the residence to both store and distribute drugs. TR 67 – 79.

3. On multiple occasions, starting in 2022 and then starting up again in 2025, Detective Miller and others had conducted surveillance on the residence and observed constant foot traffic involving who appeared to be drug-affected individuals going into and out of the residence, to include people then using drugs

on the premises, all indicators of an active and operating drug house. TR 70 – 72, 79 – 83.

4. Most of the foot traffic going into and out of the residence on NE 99th Avenue appeared to be drug customers who appeared dirty and unkept, leading Detective Miller to believe they lived a transient lifestyle and were drug-affected individuals visiting the residence to buy drugs. TR 68, 70 – 71, 81 – 83, and 91.

5. That the drug dealer who lived at this residence was sourced by a Mexico-based Drug Trafficking Organization (DTO). TR 73 – 75, 87, and 90.

6. That the DTO also had a hub operating out of Seattle, Washington. TR 90.

7. That the DTO would send their runners to meet customers at various locations, to include at the residence located on NE 99th Avenue, to re-supply the resident with controlled substances. TR 72 - 73.

The known drug house is depicted below:







On September 3, 2025, in broad daylight, while conducting surveillance right across the street from the NE 99th Avenue residence, Detective Miller made these additional observations:

1. That the drug house on NE 99th Avenue was still active. TR 84 - 85.

2. He observed the defendant show up at the residence in a vehicle and pull to the curb. TR 85.

3. The defendant's vehicle was a newer vehicle with Washington state plates, which stood out as different than what was typically observed at the house. TR 85 – 86.

4. He observed the defendant get out of the vehicle and grab a backpack and then go through the front gate and straight into the residence. TR 86.

5. The backpack the defendant was carrying appeared to have a heavy object within it, which Detective Miller believed was narcotics. 87 – 88.

6. The defendant was inside the residence for a matter of minutes. TR 88.

7. When the defendant came back out he was again carrying the backpack and this time it appeared to be lighter (it did not appear to have the same heavy object within it), thus leading Detective Miller to believe the defendant had just resupplied the drug house with narcotics. 88 – 89.

8. The defendant did not appear to be associated with a legitimate delivery service. TR 89.

9. The defendant then got back into his car and drove away. TR 90.

Detective Miller, drawing upon his training and experience as a narcotics investigator, absolutely knew that what he witnessed was the resupply of drugs to the known drug house. During the hearing, he testified as follows:

> Q. Now, at this point, stopping everything, what do you believe has just happened and why?
>
> A. I believed at that point in time Mr. Sentael arrived to the location at the drug house to deliver drugs to the drug distributor that lived at that residence.
>
> Based on the fact that I knew this was a drug house from information received from other defendants, information received from informants, community complaints, my own observations, I knew that this was a drug house, as well as my training and experience. I knew that this house was -- or the supplier who lived here was sourced by a Mexican-

> based drug trafficking organization with a hub out of Seattle. I knew that drug-affected people, customers, would come and go for short durations, for short periods of time at this residence, and then shortly after consume narcotics.
>
> All that together, I knew that this was a drug house, and I believed that, based on everything, that Mr. Sentael had gone to the residence to deliver drugs.

TR 90.

Furthermore, when the defendant drove away from the residence on NE 99th Avenue, he went to a Home Depot parking lot, parked, got out, and appeared to be looking around for someone, who the Investigators believed was likely another drug customer. TR 93 – 94.

Based upon his training and experience, and under the totality of the circumstances, Detective Miller had objectively reasonable probable cause to arrest the defendant. Detective Miller observed the defendant arrive at the house; the house was a well-known drug house from which the resident distributed drugs; Detective Miller knew that the organization supplying the house with drugs used runners to deliver drugs; the defendant was driving a newer vehicle that stood out as inconsistent with what was normally seen at the house; the defendant did not appear to be a drug affected individual like the others seen entering the house; the defendant grabbed a backpack from the vehicle and the backpack appeared to have a heavy object within it; the defendant went straight into the residence; the defendant stayed for only a brief amount of time; when the defendant left the residence the backpack he was carrying no longer appeared to contain the heavy object; and, then the defendant drove to another location, parked, and appeared to be waiting for someone.

Under the "totality of the circumstances" and viewed through the lens of a highly trained, experienced, and "reasonable and prudent narcotics officer" there was a "fair probability that the

defendant was involved in criminal activity – that he had just resupplied the known drug house with narcotics. Detective Miller and his team thus had probable cause to arrest the defendant.

**II. Investigators had probable cause to search defendant's vehicle under the mobile vehicle exception to the Fourth Amendment.**

After the defendant was lawfully arrested, because the Investigators had probable cause to believe that the defendant's car "contain[ed] evidence of a crime" they were permitted to search the vehicle pursuant to the mobile vehicle exception to the Fourth Amendment. *United States v. Rodgers*, 656 F.3d 1023, 1028 (9th Cir. 2011). Probable cause to believe that evidence will be found in a particular vehicle justifies a search of the vehicle, as well as all containers found in a vehicle, without a warrant. *California v. Acevedo*, 500 U.S. 565, 579 (1991); *United States v. Ross*, 456 U.S. 798, 825 (1982) ( mobile vehicle exception "justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). *Acevedo* is a noteworthy case with some similarities to our situation in that the Court found that the police had probable cause to search a closed container in a vehicle after they observed the defendant leave an apartment known to contain marijuana with a brown paper bag, consistent with the size of marijuana packages they had seen earlier, that he then placed in the vehicle's trunk. *Acevedo*, 500 U.S. at 567. As he drove away, the police stopped him, opened the trunk and the bag, and found marijuana. *Id.* The Court held the warrantless search was supported by probable cause and valid. *Id.* at 579.

Here, Detective Miller had an abundance of probable cause that the defendant was engaged in criminal activity and his vehicle contained additional evidence related to that criminal activity. During the hearing, in response to questioning Detective Miller stated:

> Q. Now, setting aside the consent, if we had never even talked about it, based on your training and experience of what you observed happen at

the residence on Northeast 99th, you testified that you believed he had just resupplied that house with drugs; correct?

A. That is correct.

Q. Did you believe, based on your training and experience, that there was evidence of a crime inside that vehicle prior to searching it?

A. Yes, I did.

Q. And why is that and what did you think could be inside that vehicle?

A. I believed there could potentially be more drugs in the vehicle and/or cash or monetary proceeds from drug deals, along with maybe drug paraphernalia or drug packaging.

Q. Records?

A. Records, ledgers, drug packaging.

Q. Hypothetically, say Mr. Olivas-Sentael said "You can't search my vehicle." Based on your training and experience and your federal designation as a federal task force officer, would you have searched that vehicle anyway as a mobile vehicle exception?

A. Yes, I would have. I believe there would have been a fair probability that there were drugs or indication of a crime in that vehicle.

TR 99-100.

Here, not only did Detective Miller have probable cause that the defendant had committed a drug trafficking crime, as outlined above, based both upon his training and experience, he also had reason to believe that additional drugs and other evidence would be found within the vehicle. Accordingly, Investigators were permitted to search the Passat under

///

///

///

the automobile exception to the Fourth Amendment's warrant requirement and seize any evidence they found.[1]

Inside the vehicle, Investigators found:

1. A large Ziplock bag of 164 grams of suspected fentanyl that was inside a backpack. TR 100-101.
2. Multiple plastic packaging bags from inside the backpack. TR 100.
3. $3,750.00 U.S. Currency that was inside the backpack. TR 100.
4. Two (2) digital scales with apparent drug residue on them that were found inside the backpack. *Id.*
5. Miscellaneous receipts from center console. *Id.*

8. A bag of suspected fentanyl that was found in the center console. *Id.*
9. A Motel 6 room keycard. *Id.*

Those items were lawfully seized.

## III. The government does not seek the admission of the defendant's statements that he made in the Home Depot parking lot because the translator used is not available to testify.

When the defendant was interviewed in the Home Depot parking lot, because the defendant is primarily a Spanish speaker, Detective Miller used a phone-based Spanish interpreter service. TR 95 – 97. However, since the incident that interpreter no longer works for the company and has left the country, and thus they are not available to testify. TR 96-97.

///

[1] Pursuant to their lawful search, Investigators in turn are permitted to seize any incriminating items that are in plain view. *Horton v. California*, 496 U.S. 128, 133 (1990) ("[when] an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."); *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (the warrantless seizure of an item in plain view is justified when its incriminating nature is "immediately apparent.").

Without the interpreter explaining their side of the conversation, the government cannot and will not offer defendant's statements.

**IV. The government cannot prove that defendant's consent to search his car, made in the Home Depot parking lot, was voluntarily given.**

As noted above, when the defendant, a Spanish speaking individual, was interviewed in the Home Depot parking lot Detective Miller used a phone-based Spanish interpreter service to conduct the interview and ask for consent to search the vehicle. TR 95 – 97. However, since the incident that interpreter no longer works for the company and has left the country, and thus they are not available to testify. TR 96-97. Without the interpreter explaining what they translated to the defendant and then the defendant's side of the conversation, the government cannot show the defendant provided consent to search the vehicle.

**V. The cursory warrantless search of the motel room was reasonable and does not result in the suppression of subsequently recovered evidence.**

Following defendant's arrest, Detective Miller then went to the Motel 6, located at 9225 SE Stark Street, Portland, Oregon and inquired about the room key card that was found in the defendant's Passat. The staff told Detective Miller the card was still active to room 233 and that the room was rented under the defendant's name with a checkout date of September 4, 2025.

Based upon the defendant's involvement with a much larger DTO and thus concerned that there could be a co-conspirator associated with the DTO within the room who could destroy the evidence that they also believed to be in the room, Detective Miller used the key card to access the room 233 to make sure no other occupants were present. Detective Miller did not search for evidence but only entered the room to check whether anyone else was present to ensure any potential evidence would not be destroyed or tampered with. Nothing was seized and nothing was touched. No evidence was even observed in plain view. Detective Miller then

exited the room and secured it. Two detectives then stood by to ensure no one re-entered the room.

As the Supreme Court has held, probable cause and exigency permits "warrantless searches . . . when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement" and that "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable." *Kentucky v. King*, 563 U.S. 452, 462 (2011); *Steagald v. United States*, 451 U.S. 204, 214 n. 7 ("absent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant"). Such an exigency would include "the need 'to prevent the imminent destruction of evidence.'" *King,* 563 U.S. at 460.

Detective Miller had both probable cause and a reasonable basis to believe the exigent circumstances of the situation made his entry into the motel room reasonable. In response to questioning, Detective Miller testified that:

> Q. What did you do at that room?
>
> A. We used the keycard to enter the room. We cleared the room to make sure there was no one else in the room to prevent the potential destruction of evidence, because we knew or believed that this was part of the Mexican drug trafficking organization that was supplying the dealer of the drug house and we knew that there were other members that worked for the organization.
>
> So we cleared the room to make sure there was no one else in there that could destroy evidence, and then we exited the room, and we posted two investigators on the room to make sure that no one else could reenter that room.
>
> Q. Now, at this point, when you entered that room, you had not asked him -- or did you receive his consent to search that room?
>
> A. At this point in time, no, we had not.

Q. Now, you entered it by just using the keycard, opening the door, and walking in and looking around?

A. Yes.

Q. Why did you do that to this room? And what was it specific about this case and what you knew about it that made you want to check that room?

A. I knew that he -- that Mr. Sentael worked for a drug trafficking organization. I know that this specific drug trafficking organization is very sophisticated in how they work. I know that there are multiple members of this drug trafficking organization. I know that, typically, bulk drugs are not left alone and, typically, there's someone there to either keep an eye on them to make sure that they are safe, to make sure that no one has robbed this organization of their drugs, of their means of making money.

Based on that alone, I wanted to make sure that no one was there to destroy the evidence had Mr. Sentael been able to contact someone or had another lookout or someone had watched us arrest him and knew that we had intentions on going back to seize the drugs. So I wanted to make sure the evidence in that room, potential evidence in that room, could not be destroyed, so we used the keycard to enter that room to make sure no one was there and then make sure that no one went there after we had cleared the room and made sure that no one was in that room.

Q. Now, here, for purposes -- and one of the issues that we'll deal with later is a good faith concept. Now, in talking with Mr. Olivas-Sentael with the interpretive service, did he tell you that he was working for a larger drug trafficking organization?

A. He did.

Q. Did he tell you that people would instruct him where to get drugs and where to deliver drugs?

A. Yes, he did.

Q. In talking about this organization, did he tell you there were other members of this organization?

A. Yes, he did.

Q. And in your experience with drug trafficking organizations, you talked about drugs being left at a location. Based on your training and

experience, is it typical that when someone is out delivering drugs, if there are additional drugs at a residence, hotel room, an apartment, that they may leave someone behind to ensure that they are safe?

A. Yes.

Q. Sometimes will they leave people behind to ensure cash that they've gotten from their customers at a location is safe?

A. Yes.

Q. Is drug dealing an inherently dangerous business?

A. Very dangerous.

Q. Do drug dealers get robbed of drugs?

A. Yes, they do.

Q. Do drug dealers get robbed of the money they make from drugs?

A. Yes, they do.

Q. And is this something that you've seen in practice and been taught, that sometimes they will have people keeping drugs or cash safe while they're out doing their business?

A. Yes, I have.

Q. And in your conversations with Mr. Olivas-Sentael, did that bolster your view or concern that there could, in fact, be someone in that residence that would be in a position to destroy or tamper with evidence?

A. Yes.

Q. And in a drug dealing business, do sometimes couriers, runners, or delivery people have to check in regularly?

A. Yes, they do.

Q. And who are they checking in with?

A. They're checking with -- checking in with their boss or the overseer of the organization.

Q. In addition to actively checking in, sometimes do members of the organization reach out to their delivery people, their couriers, their runners, to check on how they are doing?

A. Yes, they do.

Q. And if a check-in is made and a person does not answer the phone, what happens?

A. They -- in these organizations and in this scenario, there's a dispatcher, who is the middleman between the customer and the runner. They sort of shield the runner. The dispatcher and the runner work hand in hand. The customer calls the dispatcher who then checks in with the runner for the amount of drugs, the location of where the drug deal is supposed to happen, and after the drug deal happens, they still check in with the runner to make sure that the drug deal occurred and that they weren't arrested or robbed.

The dispatcher typically knows the area where the runner is. The "area" meaning the city or the state or the county where that runner is. So they know -- typically will know where the runner is, they will know how long it would take for the runner to get to the location where the drug buy is supposed to happen, and they have an idea, because they're speaking with the customer, of when the customer will be at that location.

So they have an idea of how long the drugs -- how long it will take for the runner to get there, how long it will take for the customer to get there. Typically, they know that the drug transaction is quick, and so they have an idea of how long this entire transaction happens.

If the runner does not check in within that time frame, that has not happened, it's safe for the dispatcher to assume that something bad has happened to the runner. For instance, they've gotten arrested, they've been robbed, something bad has happened to them. If that check-in happens and they don't hear from the runner, the dispatcher could also send another member of the organization to their stash house, which, in this case, was the motel room, to check on the drugs, to make sure that the drugs are safe if someone is not already there, or to warn that person that the runner has potentially been arrested and to take the drugs and cash and leave.

Because I know this, and because I know how drug trafficking organizations work, I believed it prudent that we go back or try to attempt to find what was in the hotel room, what they were keeping there, and make sure that no one else was there to potentially destroy or remove evidence.

Q. So why not just put deputies on the outside of this motel room and wait for a warrant?

A. At that point in time, with drugs, you know that drugs can be destroyed by many means, but typically people will flush them down the toilet. So to make sure that that didn't happen, we went inside, to make sure no one was inside. Had we posted someone outside, someone could be inside the motel room destroying potential evidence, and at that point in time, we wouldn't have any drugs to recover.

Q. And one of the things we also just briefly talked about is drug dealing being dangerous. What's the risk to deputies if you go up to a residence, in this case, this motel room, knock on the door, and ask, "Hello, anyone in there that's thinking about destroying evidence, please come out"?

A. I think that the common person would understand that the person inside that we're asking to come outside is going to say no and most likely destroy the evidence. So there's exigency.

Q. Is there the possibility of someone in that room has a weapon?

A. Yes.

Q. And can that place you and your other law enforcement investigators at danger?

A. Yes, it can.

Q. Have you ever known or heard of any situation where someone inside an apartment, hotel, or residence has shot through doors at law enforcement who's on the outside of that residence?

A. Yes.

Q. Now, here, when you entered this room, again, what was your sole purpose in making entry into this room?

A. To make sure that no one else was inside.

Q. Did you search this room in the sense of did you open drawers? Did you turn over beds? Did you do anything like that?

A. No. We looked at places where a human could be.

Q. And then after doing that, how long were you inside?

A. Not very long.
Q. Less than a minute?

A. Yes, roughly.

Q. And then did you then exit --

A. Yes, we did.

Q. -- at that point?

A. Yes.

Q. Anything that you saw in that -- or in that room, did you ever convey to Mr. Olivas-Sentael what you'd seen in that room?

A. No.

Q. You exit, post some people. Do you then conduct what we're referring to as the second interview of Mr. Olivas-Sentael? Do you travel back down to the jail and talk to him with Deputy Mendoza interpreting it?

A. Yes, we did.

TR 103-110.

Here, Detective Miller was justified in conducting a quick cursory glance through the room to make sure there was no one inside in a position to destroy evidence. He knew the defendant was a member of a DTO, that DTO's often use multiple people to carry out their illegal activities, and that there was more than a fair probability that additional evidence would be in the room. Opening the door with the key was a minimal and reasonable intrusion under the circumstances.

Furthermore, even if the Court finds that the Investigators should not have entered the room, there is nothing to suppress from *this entry* and the Exclusionary Rule does not mandate the exclusion of the evidence subsequently seized based upon defendant's consent.

First, The Investigators did not seize anything when they made a cursory inspection of the room looking for potential co-defendant and they did not use anything gleaned from their entry in gaining consent.

Second, as the Supreme Court has made clear, not all Fourth Amendment violations result in the exclusion of subsequently obtained evidence – rather suppression is a "last resort" and should only be applied where "its deterrence benefits outweigh its 'substantial societal costs.'" *Hudson v. Michigan*, 547 U.S. 586, 591, 594 (2006) (refusing to apply the exclusionary rule when officers violated the Fourth Amendment's knock and announce rule in the execution of a warrant); *Penn. Bd. of Prob. & Parole v. Scott*, 52 U.S. 357 (1998) (the exclusionary rule is a judicially created remedy that is applied "only where its deterrence benefits outweigh its substantial social costs."). The balance tips in favor of exclusion when "the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," but not "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009), *and United States v. Leon*, 468 U.S. 897, 909(1984)). Courts do not apply "the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Davis*, 564 U.S. at 240.

Defendant cites to two pre-*Hudson* cases (*United States v. Suarez*, 902 F.2d 1466 (9th Cir. 1990) and *United States v. Howard*, 828 F.2d 552 (9th Cir. 1987)) in arguing that the entry into the room tainted any subsequent consent. Not only were both cases decided well before the Supreme Court's *Hudson* opinion, which rejected the blanket assertion that any constitutional violation necessarily results in the suppression of subsequently seized evidence, but both cases are also factually distinguishable in that in both cases the person who subsequently gave consent

was present when the investigators were conducting their "exigent" searches and were then asked after the fact to give consent.

In *Howard*, the agents entered the house with guns drawn, made the people inside the residence lay on the floor for an hour, and only after the house was secured did they ask for consent. *Howard*, 828 F.2d at 554. The court held that consent was tainted under the circumstances. *Id.* at 556. Likewise in *Suarez*, the defendant was detained at gun point, handcuffed, returned to the residence and placed on his knees while officers conducted the protective sweep, had a jacket temporarily placed over his head so he could not see the undercover agents, and then after the search was asked for consent. *U.S. v. Suarez*, 729 F.Supp. 1269, 1272 (D. Nev. 1987) (setting forth the facts utilized in the subsequent Ninth Circuit opinion). The Ninth Circuit also held this fact situation tainted the subsequent consent to search. *Suarez*, 902 F.2d at 1468.

There is no "taint" here. Even with making the entry, Detective Miller did not take the defendant along with him, the defendant was not present for the initial entry into the motel room, nor did Detective Miller ever convey to the defendant that he had even gone into that motel room. As Detective Miller testified in response to questioning:

> Q. Now, prior to asking for consent to search, I'm going
> to ask some questions. When you looked in the room of Motel 6, anything
> that you saw in that room, did you tell Mr. Olivas-Sentael that you
> saw stuff in that room?
>
> A. No, I did not.
>
> Q. Did you tell him that you'd searched that room?
>
> A. No.

> Q. So whatever happened in that room, you did not convey any of that to Mr. Olivas-Sentael prior to asking for his consent to search it; correct?
>
> A. Correct.

TR 113-14.

Absent the defendant being omniscient, when he was asked for consent to search the room he had no way of knowing Detective Miller had already done a cursory inspection of the room. If the defendant did not know about the initial entry there could be no taint to his subsequent consent.

As the Supreme Court has clearly stated, just because a constitutional violation occurs that does not automatically result in the suppression of any subsequently obtained evidence. *Hudson*, 547 U.S. at 592 ("exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not sufficient, condition for suppression."). In *Hudson¸* the officers failure to comply with the "knock-and-announce" requirements was deemed a "constitutional violation of an illegal *manner* of entry" and was "*not* a but-for cause of obtaining the evidence." *Id.* Accordingly, the Court held that "[w]hether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house." *Id.*

Here, the Investigators entered the motel room in good faith to make sure no one else was present who could tamper with or destroy evidence – an exigency of valid concern – and they did not conduct a full-blown search. After verifying no one was present they quickly exited the room and then they sought consent from the defendant to fully search the room. They did not

use anything they learned in their quick and cursory search to gain consent and they could have, if consent was not given, nevertheless obtained a warrant to search the room.[2]

The officers looked in the motel room to make sure there was no one present who could tamper with or destroy evidence – a valid and noble law enforcement purpose. There is no taint from that act and no deterrent value to be gained by the suppression of the later seized evidence.

## VI. Defendant's statements while in jail were knowingly and voluntarily made, and thus admissible.

When a defendant is in custody and subject to police questioning there is a two-step process employed to determine whether any statements made by the defendant are admissible. First, a court must determine if law enforcement complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Second, the court must determine if any resulting statements were voluntarily made. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Here, agents complied with *Miranda* and the defendant's statements were voluntarily made and are thus admissible against him at trial.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The primary purpose of the Fifth Amendment is to prevent police from coercing involuntary statements from suspects. In *Miranda*, the Supreme Court established a procedural mechanism, the specific advisal of rights, to safeguard a defendant's Fifth Amendment privilege against the inherently coercive nature of custodial interrogation. *Miranda,* 384 U.S. at 444. Thus, before law enforcement agents may interrogate a suspect in custody, *Miranda* holds they must inform the suspect he has

---

[2] Unlawfully obtained evidence should not be suppressed if it would have been inevitably discovered. *Nix v. Williams*, 467 U.S. 431 (1984). If "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence will not be suppressed despite a constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989); s*ee also United States v. Ramirez*, 473 F.3d 1026, 1031 (9th Cir. 2007).

the right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford one, one will be appointed for him prior to questioning. *Id*. at 479; *see also United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006); *United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982).

A person, after being advised of his or her rights may still voluntarily, knowingly, and intelligently waive those rights. *Miranda,* 384 U.S. at 475; *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008). In assessing both the validity of the *Miranda* waiver and whether the resulting statements are voluntary, "depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *United States v. Chapman*, 175 F. 4th 1118, 1132 (9th Cir. 2026) (assessing validity of a *Miranda* waiver) (internal cites omitted); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (assessing both the validity of the *Miranda* waiver and whether the resulting statements are voluntary).

Courts consider the following factors to determine whether a defendant's *Miranda* waiver was "'knowing' and 'intelligent'": (1) defendant's mental capacity, (2) whether defendant signed a written waiver; (3) whether defendant was advised in his native tongue or had a translator; (4) whether defendant's rights were individually and/or repeatedly stated to him; and (5) whether defendant had prior experience with the criminal justice system. *Chapman*, 175 F. 4th at 1132. In assessing whether the defendant's statements are voluntary; courts examine the totality of the circumstances. *Moran*, 475 U.S. at 421; *see also Pollard,* 290 F.3d at 1034; *Derrick v. Peterson*, 924 F.2d 813, 819, 821 (9th Cir. 1990) (examining age, intelligence and past experience with justice system); *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (examining nature and location of questioning).

///

When a defendant has been advised of his constitutional rights, and there is no conduct by the police that overbears the person's free-will, the resulting statements are presumed to be voluntarily made and admissible against the person. *Id.; see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (absent coercive activity a post-advisal statement is considered voluntary for Fifth Amendment purposes); *Derrick v. Peterson*, 924 F.2d 813, 816 (9th Cir. 1990) ("a confession is only involuntary under the fourteenth amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will" and the "[p]ersonal characteristics of the defendant are constitutionally irrelevant absent proof of coercion.").

Should a subject invoke his *Miranda* rights, the police must cease interrogation. *Miranda*, 384 U.S. at 473-4.

Similarly, any statements a defendant makes after being advised of his *Miranda* rights must also be "knowingly and voluntary made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). "[T]he government must prove . . . voluntariness by a preponderance of the evidence" and "[a]n inculpatory statement is voluntary only when it is the product of a rational intellect and a free will." *United States v. Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988) (internal citations omitted). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Id*. at 1366; *see also Chapman*, 175 F. 4th at 1133 (voluntariness determined by examining whether officers obtained the defendant's statements "by physical or psychological coercion or by improper inducement."); *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) (in determining whether defendant's statements were voluntarily made, the courts look to whether "the confession [is] the product of an essentially free and

///

unconstrained choice by its maker."). The interview's length, tone, and the absence of any reticence from the defendant all factor into this analysis. *Chapman*, 175 F. 4th at 1133.

At the jail Detective Miller used a Spanish speaking corrections deputy to help translate his conversations with the defendant. While at the jail, Detective Miller utilized Corrections Deputy Juan Mendoza, a fluent Spanish speaking officer. *See* TR 11 – 15. Deputy Mendoza served as a verbatim conduit between Detective Miller and the defendant – translating what Detective Miller said in English into Spanish for the defendant and then translating the defendant's replies in Spanish into English for Detective Miller. TR 16 – 17. While counsel may hypothesize about what was said, the testimony is that Deputy Mendoza translated everything verbatim. During the interview Deputy Mendoza translated both the advisal of defendant's *Miranda* rights as well as the consent to search request. Deputy Mendoza also noted that no threats or promises were made toward the defendant and that the defendant appeared willing to talk, even friendly. TR 18 – 19.

Detective Miller testified in detail about the exchange with the defendant at the jail.

> Q. Now, at this point, Mr. Olivas-Sentael has been booked in the Multnomah County jail, but he's still in the general holding area, in the basement; is that right?
>
> A. That is correct.
>
> Q. Did you then ask for assistance in translation with Mr. Olivas-Sentael?
>
> A. Yes.
>
> Q. And why was that?
>
> A. Because, again, I do not speak Spanish.
>
> Q. And do phones sometimes not work well inside the jail?
>
> A. That's correct, yes.

Q. So here, was it Deputy Mendoza who then assisted you?

A. Yes.

Q. And the way this process worked was you speaking in English and then Deputy Mendoza translating that into Spanish for Mr. Olivas-Sentael?

A. Yes, and vice versa.

Q. Mr. Sentael would respond in Spanish, and then Deputy Mendoza would translate it in English back to you?

A. That is correct.

Q. And in talking with Deputy Mendoza, did you explain he needed to interpret him -- to interpret things verbatim?

A. Yes.

Q. Did you advise Mr. Olivas-Sentael of his constitutional Miranda warnings?

A. Yes, I did.

Q. And how did you advise him of those?

A. From memory.

Q. And what are those warnings?

A. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have them present while you're being questioned. If you cannot afford to hire one, one will be appointed to you at no expense.

Q. And did you ask then, "Knowing these rights, do you understand them?"

A. Yes, I did.

Q. Did you then ask him if he was willing to talk to you?

A. I did.

Q. And what did he say?

A. He told me that he wanted to be honest with me. He told me that he had rented the room 233 at the Motel 6 under his name. He told me he had been staying in that room. He told me he slept in that room the night prior to being arrested, so last -- the night before. He told me there were drugs in that room and there would be at least one kilo of fentanyl inside. He told me the drugs are not -- the drugs in the room are not his, but another person who he called Primo provided him with the amount of drugs he needed for customers.

Q. Did you then ask for –

THE INTERPRETER: I'm sorry. The interpreter missed that. Provided him with the amount of drugs that he would need for –

THE WITNESS: Customers.

BY MR. KERIN:
Q. Did you then ask for permission to search room 233?

A. Yes, I did.

Q. Now, in front of you, you have Exhibit Number 4. Is that the consent to search form?

A. Yes, it is.

Q. And this form, was this form reviewed with Mr. Olivas-Sentael?

A. Yes, it was.

Q. And this is the form that was originally filled out in the Home Depot parking lot; correct?

A. That is correct.

Q. Did you then add to it in line 2 "Motel 6 Room 233"?

A. Yes, I did.

Q. So that was a new addition; correct?

A. That was a new addition.

Q. And this form was reviewed with Mr. Olivas-Sentael with that addition; correct?

A. Yes.

Q. And afterwards, did he agree to you adding that and then searching room 233 at the Motel 6?

A. Yes, he did.

Q. Now, prior to asking for consent to search, I'm going to ask some questions. When you looked in the room of Motel 6, anything that you saw in that room, did you tell Mr. Olivas-Sentael that you saw stuff in that room?

A. No, I did not.

Q. Did you tell him that you'd searched that room?

A. No.

Q. So whatever happened in that room, you did not convey any of that to Mr. Olivas-Sentael prior to asking for his consent to search it; correct?

A. Correct.

Q. Now, in reviewing this consent to search, at this point, you're inside the jail, you do not have weapons with you; correct?

A. Correct.

Q. Are you still wearing your police-issued tactical vest?

A. No, I'm not.

Q. So are you in plain clothes?

A. I am.

Q. And did you make any threats to Mr. Olivas-Sentael, "If you don't give me consent, bad things will happen to you"?

A. No, I did not.

Q. Did you make him any promises?

A. No, I did not.

Q. Did you tell him if he didn't consent, you would just get a warrant anyway?

A. No. I told him if -- I told him we could apply for a warrant.

Q. Okay. And in talking with Mr. Olivas-Sentael, he mentions that he wants to be honest with you. Since we weren't there, can you describe his demeanor in how he was interacting with you?

A. Again, I would say he was calm and cooperative.

Q. Was he hostile with you?

A. Not at all.

Q. Did he appear remorseful, sad, anything like that?

A. Say remorseful, maybe a little defeated.

Here, the defendant made statements on two separate occasions: the first was immediately after his arrest in the Home Depot parking lot, which the government is not offering, and the second are the statements he made to Detective Miller during his interview at the jail. Prior to the interview in the jail the defendant was advised of his constitutional *Miranda* rights in Spanish, his native language, and he indicated that he understood his rights. The defendant was very cooperative, responded appropriately to questions, and the interview was casual. The defendant was not threatened nor was he promised anything. Under the totality of the circumstances defendant's waiver of his *Miranda* rights was knowingly and voluntarily made and his subsequent statements were likewise knowingly and voluntarily made. His statements are admissible and his motion should be denied.

///

///

**VII. The defendant's consent to search his motel room was voluntarily given.**

Voluntary consent to search constitutes a waiver of Fourth Amendment rights. *Schneckloth v. Bustamonte,* 412 U.S. 218, 235 (1973); *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023) (quoting *United States v. Basher*, 629 F.3d 1161, 1167 - 68 (9th Cir. 2011)) (law enforcement "may search a car when they are given voluntary, unequivocal, and specific consent."). Courts examine the totality of the circumstances surrounding the consent to determine whether it was given voluntarily. *Bustamonte,* 412 U.S. at 227. The government must only prove that the consent was voluntary by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 (1974).

The Ninth Circuit has identified the following five factors that courts should consider when determining whether consent to search was voluntary: "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'" *United States v. Patayan Soriano,* 361 F.3d 494, 502 (9th Cir. 2004) (*quoting United States v. Jones,* 286 F.3d 1146, 1152 (9th Cir. 2002)). Each case of consent should be examined on its own facts and no one factor is determinative of the issue of voluntariness and "these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Id.; see also, Bustamonte*, 412 U.S. at 224, (rejecting "talismanic definition of 'voluntariness' mechanically applicable" to all situations); *see also United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995) ("although we have established these factors to aid in the decision making process, the full richness of every encounter must be considered . . . Every encounter has its own facts and its own dynamics. So does every consent").

Defendant's consent to search his motel room was voluntarily given. Although the defendant was still in custody a period of time had passed since he was initially arrested. The defendant had been advised of his constitutional *Miranda* rights and the situation was calm. Detective Miller did not make any threats and he did not make any promises to the defendant. The defendant was entirely cooperative and forthcoming. Under the totality of the circumstances defendant's consent was voluntarily given and Detective Miller was justified in conducting a search of the defendant's motel room and the methamphetamine and cash discovered during the search, as identified in Exhibit 5, was justifiably seized.




**Conclusion**

Detective Miller and his team reasonably and appropriately responded to a crime that occurred before their eyes. At every step of the way the investigators acted reasonably and within the contours of both the Fourth and Fifth Amendments. For the reasons set forth herein, as well as within the government's initial response, we respectfully request that the Court deny

///

defendant's motion to suppress the physical evidence seized from his vehicle and motel room, as well as the statements he made to Detective Miller while in jail.

Dated: September 8, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ *Scott Kerin*

SCOTT M. KERIN, OSB # 965128
Assistant United States Attorney