IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

Plaintiff,

v.

RICARDO OLIVAS-SENTAEL,

Defendant.

Case No. 3:25-cr-00392-AB

OPINION & ORDER

Scott M. Kerin
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

Attorney for Plaintiff

Anna Maria Belesiotis
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204

Attorney for Defendant

**BAGGIO, District Judge:**

Defendant Ricardo Olivas-Sentael is charged with (1) conspiracy to distribute and possess with intent to distribute fentanyl and methamphetamine; (2) possession with intent to distribute fentanyl; and (3) possession with intent to distribute methamphetamine. Information, ECF No. 12. Defendant moves to suppress "all evidence derived from violations of [Defendant's] constitutional rights, including but not limited to his statements, his cellphone, and controlled substances seized from his car and his motel room." Def.'s Mot. Suppress ("Def.'s Mot.") 1, ECF No. 27. On August 3, 2026, the Court held an evidentiary hearing on Defendant's motion. *See* Mins. Proceedings, ECF No. 34. For the reasons below, the Court grants Defendant's Motion to Suppress.

**FACTS**

Detective Jarrett Miller is a detective with the Multnomah County Sheriff's Office. Tr. 47:12–14.[1] He has nine years of law enforcement experience and has been a member of the special investigations unit (SIU) since 2021. Tr. 48:5–9, 56:5–57:21. Since becoming a police officer, Detective Miller has received training on, and on-the-job experience with, drug cases, including information on how drugs are distributed, who distributes them, and how drug trafficking organizations (DTOs) work. Tr. 48:21–50:20, 54:6–56:3. As a member of the SIU, he also received specialized training and education in narcotics cases. Tr. 58:4–59:15, 61:17–63:19. He has been involved in "well over 50" drug trafficking investigations. Tr. 65:5–8.

In 2022, Detective Miller first became aware of a "drug house" located at 310 NE 99th Avenue in Portland, Oregon. Tr. 68:18–20. A cooperator from another investigation told law

[1] All citations to "Tr." refer to the transcript of the evidentiary hearing held on August 3, 2026. *See* Official Ct. Tr. Proceedings, ECF No. 35.

enforcement details about the house, including the address, the individual who resided there, and the alleged drug activity occurring at the residence. Tr. 68:21–69:7. Officers surveilled the residence a few times in 2022 and saw "signs indicative of a drug house," including "drug-affected people coming and going after . . . short stays on the property" and an unkempt front yard full of junk, debris, and trash. Tr. 70:6–71:7 (testifying that officers surveilled the house "[m]ore than three" times in 2022).

The investigation into the NE 99th Avenue house went dormant until 2024, when officers received information from a California police officer connecting the house on NE 99th Avenue to a Mexican DTO. Tr. 72:6–21. Specifically, a cellphone retrieved from a drug courier in California contained "information" (otherwise unspecified) that led officers "to other places that the [DTO was] distributing drugs," including the NE 99th Avenue house and an "old man" named Tony. Tr. 73:6–14, 126:13–15.

In 2025, officers received additional information from a different source, this time a cooperating defendant, who told law enforcement that a 70-year-old individual with significant medical issues named "Tony" lived at the address with his wife and was distributing "at least fentanyl," which was delivered to the house from a Mexican DTO. Tr. 75:13–23, 126:16–127:11. The residence was not a stash house: "Someone very much lived there." Tr. 127:15–18. Specifically, the cooperator—who was a member of the Mexican DTO—informed Detective Miller that "Tony . . . was a major customer of the [DTO]." Tr. 76:10–14.

Officers also received "drug house complaints" about the NE 99th Avenue residence. Tr. 76:18–20. Neighbors and others reported that a drug dealer lived at the residence, that there was a lot of foot traffic at the residence day and night, and that drug use was occurring on and around the property. Tr. 78:21–79:3.

Officers again began surveilling the NE 99th Avenue house in 2025, surveilling it "more than five" times over the course of that year. Tr. 79:8–25. In total, officers had observed the house over ten times since the investigation started in 2022. Tr. 79:8–25. According to Detective Miller, each time officers would surveil the house for at least thirty minutes to "maybe an hour or so." Tr. 80:9–15. In his surveillance, Detective Miller continued to see a pattern of individuals coming and going from the property and staying for only short periods of time. Tr. 80:16–23. Detective Miller testified that people would let themselves into the property through the gate instead of knocking or having someone greet and escort them in. Tr. 81:1–4. Many of the individuals appeared to be homeless or transient, carrying backpacks, bags, or carts with them and arriving in older, broken-down vehicles; on foot; or by scooter or bicycle. Tr. 81:5–10. Most of these individuals appeared to be drug-affected. Tr. 81:12–16. They would consume narcotics—including fentanyl—away from the home "in a vehicle or out in public." Tr. 82:1–18.

In the late morning of September 3, 2025, Detective Miller was surveilling the residence with a clear view from across the street. Tr. 83:7–84:20. As he had in the past, Detective Miller saw individuals come and go from the property. Tr. 84:21–85:1. A "newer" black Volkswagen Passat with Washington license plates that "parked in close proximity to" the house caught Detective Miller's eye. Tr. 85:2–8. Detective Miller testified that the car and the driver stood out. The Passat appeared "registered," "newer," and a "nice clean-looking vehicle." Tr. 85:9–10, 86:21–87:5. The driver—Defendant—did not look like the individuals typically coming or going from the house. Tr. 85:7–23, 87:6–10. Defendant was a Hispanic man in "cleaner, nice clothes." Tr. 85:7–13, 86:2–4. Defendant's Hispanic heritage stood out because Detective Miller had been told that a Mexican DTO supplied the drugs at the NE 99th Avenue house. Tr. 87:11–17. The vehicle's Washington plates stood out because the Mexican DTO had a hub out of Seattle,

Washington. Tr. 90:6–12. Detective Miller also had information that the Mexican DTO used a red Toyota Camry, but nothing about a black Volkswagen Passat. Tr. 123:18–124:5.

Detective Miller then observed Defendant grab a black, cloth backpack from the rear passenger seat as he exited the vehicle and walk through the front gate into the residence. Tr. 86:9–15, 120:7–18, 121:19–25. Detective Miller said that this "caught [his] eye" as the backpack "appeared to be weighted, as in it appeared to contain a larger object." Tr. 86:9–12. Defendant carried the backpack in his hand and was favoring the side with the bag as he walked into the residence. Tr. 88:1–5. The outline of the backpack also suggested it contained a "larger object." Tr. 88:6–8. Detective Miller could not see what happened inside of the house. Tr. 122:25–123:10. After "a matter of minutes," Defendant exited the residence, and the backpack appeared to be "significantly lighter." Tr. 86:16–18, 88:11–89:2. Defendant "sort of slung" the bag over his shoulder, got back into the Passat, and left. Tr. 86:18–19. There was no indication that Defendant was associated with another delivery service, such as Amazon, Lyft, or DoorDash. Tr. 89:3–17. Despite his multi-year and multi-source investigation into the house, Detective Miller had never seen Defendant before and had no information whatsoever about Defendant prior to September 3, 2025. Tr. 90:3–5, 118:14–119:2.

Detective Miller testified that—in his training and experience—drug suppliers are sometimes comfortable enough to resupply distributors at their residence. Tr. 91:24–4. Drug resupplies tend to happen quickly because drugs are a high-value item and distributors "worr[y] about being robbed of their drugs," especially at a house that "could be full of drug users." Tr. 92:19–25. It can be "very dangerous for the supplier," so they will leave quickly. Tr. 92:19–93:3.

Detective Miller testified that he believed, because of these facts and his training and experience, that Defendant had arrived at the house to deliver drugs to the residence and that he had probable cause to arrest Defendant. Tr. 90:16–91:8, 93:9–11.

Detective Miller and other officers followed Defendant as he left the house in the black Passat. Tr. 93:12–14. Defendant "drove to a nearby Home Depot parking lot in North Portland." Tr. 93:16–17. He did not make any furtive movements, evasive maneuvers, or prolonged stops on his way to the store. Tr. 130:13–131:4. Defendant parked his vehicle "sort of on the outskirts of the lot," but there were other cars parked nearby. Tr. 93:20–21, 131:25–132:4. Detective Miller testified that he found it interesting that Defendant did not park closer to the front entrance, where a normal customer would. Tr. 93:18–21. One of the other officers observed Defendant look around the parking lot as he got out of his vehicle. Tr. 93:22–25; 133:5–9. Officers believed "he was looking for another customer, at which point in time [they] decided to contact and arrest" Defendant. Tr. 93:24–94:1. Defendant was back inside his vehicle by the time officers used their vehicles to pin the Passat. Tr. 133:8–10. Guns drawn, the officers directed Defendant to exit the vehicle and then handcuffed him. Tr. 94:8–11. Defendant was at this point under arrest. *See* Tr. 93:16–95:4. Officers then put their firearms away, and Detective Miller placed Defendant in his vehicle and proceeded to interview him using an interpreter service.[2] Tr. 94:11, 95:5–13. Officers subsequently searched—without a warrant—the car and a hotel room associated with Defendant and seized the evidence supporting the charges in this case.[3] Officers

---

[2] The Government was unable to locate the interpreter to have them testify at the suppression hearing; therefore, the Government concedes that it may not rely on any alleged statements made by Defendant during his arrest at the Home Depot. *See* Tr. 5:13–22, 6:2–17.

[3] Because the Court finds that there was no probable cause to arrest Defendant, the Court declines to make additional factual findings involving the interviews with Defendant or the searches of the car and the hotel room.

specifically found inside the black backpack in the Passat a "large Ziplock bag of fentanyl" weighing approximately 164 grams, multiple packing bags, $3,750 in cash, and two digital scales with drug residue. Tr. 100:19–101:5.

**STANDARDS**

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Warrantless searches and seizures violate the Fourth Amendment unless they fall within one of "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Because warrantless searches . . . are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

Under the exclusionary rule, a criminal defendant may move to suppress evidence seized in violation of the Fourth Amendment. Fed. R. Crim. P. 41(h). The exclusionary rule applies to evidence obtained as a direct result of an illegal search or seizure and includes evidence derived from the illegality—known as "fruit of the poisonous tree." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020). When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation has occurred and then whether suppression is appropriate. *See id.* at 1290–91 ("Because the opening of the car door and leaning into the car constituted an unlawful search, we must consider what remedy is appropriate."). "The typical remedy for a

Fourth Amendment violation is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant." *United States v. Garcia*, 974 F.3d 1071, 1075 (9th Cir. 2020).

**DISCUSSION**

Defendant moves to suppress evidence and statements obtained by SIU officers. *See generally* Def.'s Mot. First, Defendant argues that his arrest was not supported by probable cause and, therefore, all evidence should be suppressed. *Id.* at 1–2, 5–8. Second, Defendant argues that all evidence found in Defendant's Motel 6 room should be suppressed because officers entered Defendant's motel room without a warrant or a valid warrant exception. *Id.* at 2, 8–10. Third, Defendant argues that any evidence obtained through Defendant's consent to search his car, his cellphone, and his motel room should be excluded because his consent was not "offered knowingly and voluntarily in light of the attendant circumstances." *Id.* at 2, 10–12. Finally, Defendant argues that his statements should be suppressed because Defendant did not make them voluntarily. *Id.* at 2, 12–13. Because the Court finds—as an initial matter—that the Government lacked probable cause to arrest Defendant, the Court grants Defendant's motion and suppresses all the evidence stemming from his arrest.

"The Government bears the burden of showing that a warrantless arrest did not violate the Fourth Amendment." *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). "Our precedent requires a conclusion that the officers had probable cause to arrest [a defendant] if 'under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002) (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)). In determining whether probable cause exists,

"judgments made by law enforcement officers in the heat of their battle against crime need not be assessed in the abstract; weight may be given to the experienced judgment of the officers." *Id.*

Courts must also "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Courts may consider "otherwise innocent behavior" which "may be indicative of criminality when viewed in context." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002). "Law enforcement officers may draw upon their experience and expertise in determining the existence of probable cause." *Garza*, 980 F.2d at 550. "Mere suspicion, common rumor, or even a strong reason to suspect are not high enough" to establish probable cause. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

As is relevant here, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). This mere presence doctrine stands for the principle that probable cause must be "particularized with respect to that person" and that it is insufficient to merely "point[] to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* But the mere presence doctrine is less likely to apply if "attendant facts and circumstances support a fair probability that [the defendant] was linked to the crime of drug trafficking." *United States v. Buckner*, 179 F.3d 834, 839 (9th Cir. 1999). Further, where surveillance of suspected criminal activity reveals a

"pattern of activity indicating participation in a narcotics transaction," the court need not consider the "presence or absence of any particular observation alone." *United States v. Del Vizo*, 918 F.2d 821, 827 (9th Cir. 1990) (citation modified).

In *Sibron v. New York*, the defendant was observed talking with a number of known narcotics addicts over an eight-hour period, but the observing law enforcement officer "was not acquainted with [the defendant] and had no information concerning him." 392 U.S. 40, 62 (1968). Additionally, the law enforcement officer was "completely ignorant regarding the content of [the] conversations" between the defendant and the known narcotics addicts. *Id.* In holding that "[n]othing resembling probable cause existed until after the search had turned up the envelopes of heroin," the Supreme Court explained that "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." *Id.* at 62–63.

Similarly, in *United States v. Robertson*, the Ninth Circuit found that officers lacked probable cause to arrest a defendant "leaving a house where the officers had probable cause to believe that criminal activity was afoot." 833 F.2d 777, 784 (9th Cir. 1987). There, officers learned from an anonymous call that an individual—Johnson—and two associates were manufacturing methamphetamine in a residence in Springfield, Oregon. *Id.* at 778. More specifically, the anonymous caller claimed she had been present inside the residence that very morning and that Johnson and two others were operating a "crank lab" inside the home. *Id.* After conducting their own investigation of Johnson and learning he had an outstanding warrant for his arrest for manufacturing methamphetamine, officers surveilled the house. *Id.* They observed coverings over the windows of the residence and garage and found a nearby truck that was

registered to an individual with a drug record. *Id.* Officers approached the residence to arrest Johnson and saw the defendant leaving the house on the walkway. *Id.* at 779. Officers told the defendant to "freeze and displayed guns." *Id.* Officers told the defendant she could leave if she left her backpack and purse behind. *Id.* When the defendant refused, officers obtained a search warrant to search her backpack and the house. *Id.* The defendant's fingerprints were found inside the house on the laboratory equipment that was used for manufacturing methamphetamine, and formulas for making methamphetamine were found in the defendant's handwriting in her backpack. *Id.*

The panel concluded that "probable cause for [the defendant's] arrest was absent" because "[f]or all that was then known to the officers, [the defendant] was an innocent visitor." *Id.* at 782. The circuit court emphasized that there was no dispute that "that the officers had probable cause to believe that criminal activity was afoot in the house," but that there was no particularized probable cause with respect to the defendant. *Id.* at 783. "Her mere presence on the premises, without more, [could not] support an arrest of her under these circumstances." *Id.* at 782; *see also id.* at 783 ("Beyond mere proximity to Johnson and the house, the government can identify no probable cause which would lead a prudent person to believe [the defendant] had committed or was committing a criminal offense . . . .").

Here, too, although the Government may have had probable cause to justify obtaining a search warrant for the residence,[4] even considering Detective Miller's extensive training and experience with narcotics investigations, there was insufficient probable cause particularized to Defendant to justify his arrest. Detective Miller testified that from 2022 to 2025, law

[4] Officers did not seek a search warrant for the residence until a month after Defendant's arrest. Tr. 128:9–17.

enforcement had only surveilled the house ten times for thirty minutes to an hour each time. During their surveillance, law enforcement officers observed many people coming and going from the residence, sometimes arriving in vehicles, often carrying backpacks or bags, often letting themselves in through the front gate, and mostly staying for only short periods of time. Law enforcement officers did not observe any drug transactions at—or deliveries to—the home. Detective Miller received information from police in California and sources in Oregon that a person who lived in the house sold controlled substances sourced by a Mexican DTO, which had a hub in Seattle, Washington. But neither their sources nor their surveillance provided law enforcement any information about future or past drug deliveries to the home—such as how often they occurred, what time of day they took place, the typical size of a delivery, or who made the deliveries. Detective Miller had no information about Defendant specifically and had never seen or heard any information about the black Passat prior to this incident. According to Detective Miller's own testimony, Defendant's only connections to the Mexican DTO—apart from his mere presence at the house—were his apparent Hispanic heritage and the Washington license plates on his car. But these details—which are applicable to many law-abiding individuals in Portland—are insufficient on their own to establish probable cause. *See United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) (holding that to establish the lower bar of reasonable suspicion, "an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population").

Detective Miller also observed Defendant entering and exiting the home with a backpack that appeared lighter after Defendant exited the home because of how he carried it. But Detective Miller was otherwise "completely ignorant" of what happened inside of the NE 99th Avenue residence. *See Sibron*, 392 U.S. at 62; *cf. Valencia-Amezcua*, 278 F.3d at 907–08 (finding

probable cause to arrest was supported by more than mere presence where defendant's position on a bed with two others "block[ed]" and "obscure[ed]" the hidden entrance to a "large-scale methamphetamine production operation requiring the participation of several workers," and "suggested a purpose to deter the officers from its discovery."). A Hispanic person, looking reasonably clean and well-kept, driving a decade-old vehicle with Washington plates, carrying a backpack, and briefly visiting the home of an elderly couple that was also a suspected drug house with connections to a Mexican DTO, is insufficient evidence to support a fair probability that Defendant was linked to the crime of drug trafficking.

The subsequent events at the Home Depot parking lot do not cure this insufficiency. Defendant did not engage in any furtive movements, evasive maneuvers, or prolonged stops on the way to the store. And although Detective Miller testified that he found it "interesting" that Defendant parked further from the front entrance than where a typical customer would, he also testified that there were other vehicles parked nearby. Another officer observed Defendant exit his vehicle and look around the lot, but they did not observe Defendant engage in a drug transaction or any other suspicious conduct prior to the officers pinning Defendant's car.

In sum, this case is like *Robertson.* Considering the totality of the circumstances known to Detective Miller and viewed from the standpoint of an objectively reasonable police officer, a prudent person would not have concluded that there was a fair probability that Defendant had committed or was committing a crime. Accordingly, there was no probable cause to arrest Defendant.

Because the Government lacked probable cause to arrest Defendant, all the evidence obtained thereafter must be suppressed. "Evidence seized during an unlawful search cannot constitute proof against the victim of the search. The exclusionary prohibition extends as well to

the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (citation modified). Here, all the evidence seized from the car and the hotel room, as well as Defendant's statements to law enforcement, are fruits of the unlawful arrest and therefore must be suppressed.[5]

**CONCLUSION**

Because the Government lacked probable cause to arrest Defendant, the Court GRANTS Defendant's Motion to Suppress [27].

IT IS SO ORDERED.

DATED this 30th day of September, 2026.

AMY M. BAGGIO
United States District Judge

[5] Even if officers had reasonable suspicion to briefly detain Defendant, *see United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) ("[R]easonable suspicion exists when an officer is aware of specific articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion."), they still lacked probable cause to arrest Defendant or search the vehicle, *see Robertson*, 833 F.2d at 780 ("A *Terry* stop involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons."). The Government does not argue that the investigatory stop of Defendant would permit officers to search Defendant's vehicle. *See* Gov't Suppl. Reply 9, ECF No. 39 (arguing "[i]nvestigators had probable cause to search [D]efendant's vehicle"); Gov't Resp. 16–17, ECF No. 31 (arguing only that reasonable suspicion would permit Defendant's detention and questioning). And the Government concedes that there was no consent to search the vehicle. *See* Gov't Suppl. Reply 3.